GRIST *v.* CARLTON.

**1. VENDOR AND PURCHASER—FORFEITURE OF LAND CONTRACT—EQUITY.**

Equity has discretionary power to relieve a person from a harsh forfeiture, where he is ready and willing to make full payment, there are very unusual circumstances which appeal to the conscience of the court, and the party seeking to enforce the forfeiture will receive everything to which he would have been entitled under his land contract had there been no forfeiture.

**2. SAME—FORECLOSURE—FORFEITURE—TENDER.**

Equity is loath to declare forfeiture of premises to vendors in land contract when adequate tender had been made by vendees to redeem within such time as they had been led by vendors to believe was proper.

**3. SAME—TENDER—REDEMPTION.**

Vendees of farm who tendered full amount due on land contract within time they had been led by vendor to believe was proper, are accorded right to redeem from foreclosure within 60 days from entry of decree in circuit court on remand from Supreme Court.

Appeal from Kalamazoo; Hughes (Sam Street), J., presiding. Submitted January 13, 1960. (Docket No. 57, Calendar No. 48,337.) Decided June 7, 1960.

Bill by Morris H. Grist and Arletta G. Grist against Rosemary Carlton to compel acceptance of sums tendered for redemption of foreclosed land con-

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 55 Am Jur, Vendor and Purchaser § 642.

Relief of purchaser against forfeiture of land contract. 40 ALR 182.

tract. Decree for defendant. Plaintiffs appeal. Reversed and remanded.

*Leo W. Hoffman* and *Frederick D. McDonald,* for plaintiffs.

*Morden P. Schuur,* for defendant.

KELLY, J. Plaintiffs' land contract covering purchase of a farm was foreclosed April 16, 1958. No appeal was taken from the default. Plaintiffs admit the regularity of the foreclosure.

After the foreclosure proceedings and judgment, defendant extended the redemption period to July 24, 1958. On that date defendant tendered to plaintiffs, and plaintiffs signed, an agreement whereby for a monthly rental of $375 plaintiffs could remain on the farm until September 30, 1958, and also an option or right to purchase said farm before September 30th, for $20,000. On September 25, 1958, plaintiffs offered to defendant $15,600 as the amount due on the land contract. Defendant refused to accept the offer.

Plaintiffs filed bill of complaint to compel defendant to accept payment on the land contract. Plaintiffs contend:

"Defendant, by leading the plaintiffs to believe that she would refinance the contract, should not now be permitted to say that the equity of redemption has expired, and that the farm is hers. By statements made by her agent, plaintiffs lost an opportunity to refinance the contract prior to the expiration of the redemption as extended. Defendant should not be permitted to take advantage of this situation created by her agent's conduct."

The trial court stated:

"This court is of the opinion that under all of the facts and circumstances disclosed by the evidence

given at the trial the plaintiffs have not met the burden of proof incumbent upon them to set aside and extend the expiration of the redemption period, under the foreclosure proceedings from July 24, 1958 (agreed extension date), to and including September 25, 1958, the date upon which plaintiffs offered to purchase the premises again for $15,600, or, as they allege, to pay the balance due on said land contract."

In this appeal plaintiffs present but 1 question, namely: "Were plaintiffs entitled to relief by way of equitable redemption?"

The negotiations toward refinancing after foreclosure were conducted by Mr. Stearns, as plaintiffs' attorney, and Mr. Carlton, as attorney, husband, and agent of defendant.

Stearns testified that he notified Carlton on July 14th that he "had just received an offer to refinance the matter for them at a profit of $5,000, upon a land contract of approximately $20,000, with reasonable payments and, in any event, to be paid out by means of a bank loan or something like that at the end of 4 years, but it would be reasonable payments and then a 4-year limit on the refinancing"; that Carlton extended the date of redemption to July 18th and in the interval came to Stearns' office and made 2 offers:

"One would be that the Grists could stay on the farm as tenants until, I believe it was September, but it was sometime in the fall, September or October, to give them an opportunity to sell the heifers that they were feeding; that they would then move out of the farm house but could come back later in the fall and harvest the corn crop that was there. That was one proposition. And the other would be that he would give them a new land contract for $20,000 with reasonable payments but to be cleared up within 4 years";

that on July 24th he notified Carlton "that the Grists would accept his offer of a 4-year lease option on reasonable payments at the $20,000 figure"; that he was unable to accompany plaintiffs to Carlton's office, and when they brought back to him the lease and option Carlton had prepared, he advised them not to sign it.

Carlton denied Stearns' testimony in regard to his agreement for a 4-year $20,000 new land contract, but admitted that he had extended the redemption period to July 24th, and that at the time he presented the lease and option to the Grists, he said to them:

"But I did tell them, I made it very plain, that I didn't care whether they took the lease or not. I was willing to offer it to them, and if they did not care to do it that I had nothing left but to evict them."

Carlton admitted that after he had received the signed lease agreement Stearns called him and "said something to the effect 'I think you gave the Grists a rotten deal.' He said, 'I understood we were going to meet and negotiate this lease.' And I told him that that wasn't my understanding, but that if he and the Grists were not satisfied I would tear that lease up any time he asked me to."

Plaintiff Arletta G. Grist, relating her visit to Carlton's office, testified:

"I walked into his office, Morris and I walked in together, and I said to Mr. Carlton, 'Mr. Stearns has a client in his office right now but he will be over in a few minutes,' and he leaned back in his chair and he said, 'As of now, you know as of now, the farm is mine; I can kick you off tonight if I want to,' or words to that effect on the 'want to' part. And I was just stunned. I told you I didn't know, I didn't understand it, because I was going up for a 4-year lease option. So, I sat down in a chair then, and he opened his drawer and he pulled out this paper and he started to read it. * * *

"And he started to read this agreement off and he got down to the 60-day part and I said, 'Russ, that isn't the agreement that you and Stearns talked about.' * * *

"Well, Mr. Carlton didn't answer me; he kept right on reading. And he read a little farther and I said, 'Mr. Carlton,'—or 'Russ,' I don't remember which I called him because sometimes I call him Russ and sometimes Mr. Carlton—and I said, 'Mr. Stearns will be here in a few minutes; I think we had better wait for him.' And he kept right on reading. So, then he ended up and I started to object again, and my husband said, 'Arletta, you had better  *  *  *'— he pointed over to me and the telephone rang and Mr. Carlton answered the telephone, and during that space of time that he was on the telephone, Morris told me I had better keep still because he could kick us off right then.  *  *  *

"My husband said to him, 'Well, now, Russ, in other words,' he said, 'your mind is made up?' and he said, 'If we don't sign this lease, then we can get off.' And Mr. Carlton said, 'Yes, that's right.' And then Mr. Carlton sat there a few minutes and Morris said, 'Well, I think  *  *  *' as I remember Morris said, 'I think my attorney ought to look this over.' And Russ said, 'Yes, you had better.' So, he said, 'Do you want me to sign it now?' And Russ said, 'You can take it and have him look it over.' As I remember that was his words.

"*Q.* Then did you sign this agreement?

"*A.* Yes, I did.

"*Q.* Why did you sign it?

"*A.* I didn't have any other choice. I didn't know what to do; we were dumbfounded; what would we do with all our steers and everything out there in the road, no place to go, when we were depending on the 4-year contract. In other words, we were stunned.

"*Q.* Well, why did you sign it? Why did you sign the agreement then?

"*A.* In the circumstances there was nothing else we could do."

On September 25, 1958, plaintiffs and their 2 attorneys, Mr. Stearns and Mr. Hinga, went to Carlton's office. Carlton described what happened as follows:

"On that occasion Mr. Hinga, the lawyer, laid a sum of money on my desk at that time and stated it to be $15,600. He asked me if I cared to count it and I said I didn't."

Carlton refused the offer and said he would advise his wife to refuse it. When asked whether the tender was not the amount due on the contract he answered:

"I don't believe the $15,600 was the amount due on the contract, at that time, I didn't compute it. At that time there wasn't anything due on the contract, it had been foreclosed. As to whether it would have been due on the contract if it hadn't been foreclosed, I don't believe it would come out to an even figure like that. I believe it was more. I don't know how much more."

Mrs. Grist called Mrs. Carlton and asked her to accept the $15,600, and Mrs. Carlton refused. Plaintiffs then paid the $15,600 into court and filed this suit.

Testimony was not introduced as to the value of the farm, but when questioned as to how he arrived at the $20,000 figure in the option, Carlton stated:

"As to how I arrived at the option figure of $20,000 in cash. Mr. and Mrs. Grist had both discussed the sale of the property with me on several occasions, and they both indicated they were satisfied the property was worth $30,000. And I figured if they wished to sell it that they could recover their investment in the property and get something out of it. In other words if their figure was correct, $30,000, and

they sold the property, they would be in a position to net around $10,000."

Plaintiffs had purchased the farm from a Mr. and Mrs. Schutz on land contract for the sum of $20,000, paying $6,000 down. Defendant had acquired vendor Schutz' interest for $11,000.

In *Marble* v. *Butler,* 249 Mich 276, 279, 280, we said:

"This Court has frequently relieved a person from a harsh forfeiture where he is ready and willing to make full payment, and where there are very unusual circumstances which appeal to the conscience of the Court, and where the party seeking to enforce the forfeiture will receive everything to which he would have been entitled under his contract had there been no forfeiture. This right to redeem, as is sought in the amended or supplemental bill of complaint, rests in the sound discretion of the Court."

We quote from *Piper* v. *Libiszewski,* 247 Mich 381, 383, as follows:

"Equity is loath to declare a forfeiture to plaintiffs of premises when adequate tender has been made by defendants to redeem within such time as defendants have been led by plaintiffs to believe was proper. We think defendants should be allowed to redeem in 30 days from the entry of the final decree in this Court by paying the full amount due on the contract, together with the costs of foreclosure and sale and interest to the date of redemption. A decree will be entered so providing, with costs of this Court to defendants."

The record sustained plaintiffs' prayer for equitable relief, and the decree is reversed and the cause remanded to the circuit court for determination of sums now necessary for redemption and for entry of decree in accordance herewith. A 60-day period

from entry of such decree is granted plaintiffs to redeem. Costs to plaintiffs.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred.